UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

APRIL EDWARDS,

                              Plaintiff,

        v.

NEW YORK STATE TROOPER VINCENT
T. CASTRO; NEW YORK STATE
TROOPER ANTHONY P. EATON,

                              Defendants.

No. 16-CV-2383 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Steven M. Warshawsky, Esq.
Law Firm of Steven M. Warshawsky
New York, NY
*Counsel for Plaintiff*

Mary Kim, Esq.
Yan Fu, Esq.
Daniel A. Schulze, Esq.
Julinda A. Dawkins, Esq.
New York State Office of the Attorney General
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff April Edwards ("Edwards") brought this Action, pursuant to 42 U.S.C. § 1983,

against New York State Troopers Vincent T. Castro ("Castro") and Anthony P. Eaton ("Eaton")

(collectively, "Defendants"), for an allegedly unlawful traffic stop, custodial interrogation, false

arrest, and search of her personal bag, in violation of the Fourth Amendment and state law.

(Compl. (Dkt. No. 1).)[1]  Before the Court is Defendants' Motion for Summary Judgment.

(Notice of Mot. for Summ. J. (Dkt. No. 37).)  For the following reasons, the Motion is granted in

part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from Plaintiff's Complaint (Compl.), Defendants' statement

pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 42)),

Plaintiff's response to Defendants' 56.1 Statement, (Pl.'s Obj. and Resp. to Defs.' Rule 56.1

Statement ("Pl.'s 56.1") (Dkt. No. 45)), and the exhibits submitted by the Parties, (Decl. of

Vincent Castro in Supp. of Mot. for Summ. J. ("Castro Decl.") (Dkt. No. 38); Decl. of Anthony

Eaton in Supp. of Mot. for Summ. J. ("Eaton Decl.") (Dkt. No. 39); Decl. of Donald DeQuarto in

Supp. of Mot. for Summ. J. ("DeQuarto Decl.") (Dkt. No. 40); Decl. of Kristen R. Vogel, Esq. in

Supp. of Mot. for Summ. J. ("Vogel Decl."); Decl. of Steven M. Warshawsky, Esq. in Opp'n to

Mot. for Summ. J. ("Warshawsky Decl.") (Dkt. No. 46)), and are recounted in the light most

favorable to Plaintiff, the non-movant.  The facts as described below are not in dispute unless

indicated otherwise.

On July 30, 2015, Plaintiff was driving westbound on New York Interstate 84 in a rental

vehicle with Florida license plates.  (Compl. ¶ 9; Castro Decl. ¶¶ 7–8; Eaton Decl. ¶¶ 7–8; Defs.'

56.1 ¶¶ 5, 7.)  Plaintiff's then-boyfriend, Tamarkis Lowery ("Lowery"), was in the passenger

seat.  (Compl. ¶ 9; Defs.' 56.1 ¶ 6.)  Both Plaintiff and Lowery are African-American.  (Compl.

¶ 13.)  Lowery's mother rented the vehicle for Lowery that morning, and Plaintiff was not

---

[1] Plaintiff also brought claims for the unlawful search of the rental car and for false imprisonment, (Compl.), but voluntarily withdrew those claims after Defendants filed the instant Motion, (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. (Dkt. No. 44) 2, 7, 12–13.)

present.  (Defs.' 56.1 ¶¶ 8–10.)  Lowery drove the vehicle from Ohio to New York while

Plaintiff slept in the front passenger seat.  (*Id.* ¶ 11.)  However, at some point, he asked Plaintiff

to drive.  (*Id.* ¶ 12.)

Shortly afterward, at approximately 9:00 pm, Castro and Eaton pulled over Plaintiff's

vehicle.  (*Id.* ¶¶ 5, 12.)[2]  Plaintiff had only been driving the vehicle for a few minutes.  (*Id.* ¶ 13.)

Defendants contend that they observed the vehicle cross over a solid yellow line on the left-hand

side of the passing lane of the interstate, in violation of N.Y. Vehicle and Traffic Law ("N.Y.

VTL") § 1128(d).  (Castro Decl. ¶ 8; Eaton Decl. ¶ 8; Warshawsky Decl. Ex. 3 ("Castro Incident

Statement"), at 2; Warshawsky Decl. Ex 4 ("Eaton Incident Statement"), at 2.)  Defendants then

observed the vehicle change lanes and substantially reduce its speed "so as to cause an

interference or obstruction with the operation of other vehicles operating westbound," in

violation of N.Y. VTL § 1181(a).  (Castro Decl. ¶ 9; *see also* Eaton Decl. ¶ 9 (same).)

Specifically, Defendants determined that "the vehicle was interfering with the flow of traffic"

because at least three vehicles had to pass Plaintiff's vehicle on the left side.  (Castro Decl. ¶ 10;

Eaton Decl. ¶ 10.)  Therefore, Castro drove into the other lane and Defendants determined that

Plaintiff's vehicle was moving at 50 miles per hour, in a posted 65 mile per hour speed zone.

(Castro Decl. ¶ 11; Eaton Decl. ¶ 11; Castro Incident Statement 2; Eaton Incident Statement 2.)

Defendants claim they observed Plaintiff's vehicle for approximately one mile before pulling her

over.  (Castro Decl. ¶ 12; Eaton Decl. ¶ 12.)

By contrast, Plaintiff denies crossing over any yellow lines.  (Warshawsky Decl. Ex. 5

("Pl.'s Dep."), at 143–44 (answering "[n]o" to questions of whether she recalled crossing over

---

[2] Both troopers have received training on vehicle and traffic law and probable cause, and have made numerous arrests of individuals who were found to possess illegal narcotics.  (Defs.' 56.1 ¶¶ 3–4.)

the yellow line and whether her car ever crossed over the line); *id.* at 148–49 ("Q: At any point prior to the traffic stop did you incorrectly or improperly cross over any of the traffic lines on the highway?  A: No.").)[3]  Lowery similarly testified that their vehicle remained in the right lane the entire time they were on the highway.  (Warshawsky Decl. Ex. 6 ("Lowery Dep."), at 43–44 ("I believe it was in the right lane.  I want to say, yeah, I believe it was on the right lane the whole time we got stopped."); *id.* at 49 (testifying that they were in the "[r]ight lane the entire time" between merging onto the highway and being stopped, and that the vehicle never swerved "at all").)  With respect to the vehicle's speed, Plaintiff testified, "I don't know the exact speed" when they were pulled over, (Pl.'s Dep. 52; *id.* at 57 (testifying that she "wasn't looking at [her] speed")), but that she had reached the speed one would normally drive on a highway and "was just trying to keep up with the traffic," (*id.* at 53), and specifically "was just keeping up with the semi[-]truck which was in front of [her]"), (*id.* at 57).  She denied ever reducing her speed significantly and thereby impeding the traffic behind her, stating "[t]he only time I slowed down was when [Castro] was pulling us over."  (*Id.* at 144.)  Lowery testified that, "getting on the highway . . . if [y]ou ask [him], [they] w[ere] doing, like, 60 maybe, 60 [miles per hour][,[]][he] want[ed] to say."  (Lowery Dep. 46.)  However, he also testified that, "say [they] w[ere] going slow or whatever . . . I guess that's why [another car] went around" them as they were merging.  (*Id.*)

   After the vehicle was pulled over, Eaton approached the driver's side where Plaintiff was sitting.  (Defs.' 56.1 ¶ 15.)  Eaton asked Plaintiff for her license and registration.  (*Id.* ¶ 17.)  He

---

[3] The Parties submitted excerpts from Plaintiff's and Lowery's depositions. (Warshawsky Decl. Exs. 5, 6; Vogel Decl. Exs. A, B.)  For ease of reference, when the Court cites to "Pl.'s Dep." or "Lowery Dep.," it is citing to the page excerpted in whichever Party's submission that page is found in; the Court will not further distinguish between the two versions of these depositions throughout this Opinion.

then asked her to step out of the vehicle and accompany him to the back of the rental vehicle. (*Id.* ¶ 18.)  Eaton asked Plaintiff questions about where she was going, where she was coming from, and why she was in New York.  (*Id.* ¶ 19.)  Specifically, Eaton avers that Plaintiff said she was in New York to go shopping, that she had arrived approximately two days ago, and that she was now headed back to Ohio.  (Eaton Decl. ¶¶ 18, 20; *but see* Pl.'s Dep. 70–71 (testifying that they were headed *to* go shopping, and that they were heading *to* New York).)  Plaintiff also allegedly stated that she was coming from Albany, where she had left approximately 5 minutes earlier; Eaton thought this was strange because their current location was one-and-a-half hours away from Albany.  (Eaton Decl. ¶¶ 18–19; *see also* Pl.'s Dep. 71–73 (testifying that she told Eaton that the last sign she saw was for Albany but that she did not know where they were).)

As Castro approached the vehicle on the passenger side, he observed Lowery trying to stuff a backpack underneath the passenger seat.  (Defs.' 56.1 ¶ 16; *see also* Pl.'s Dep. 45, 145–46 (testifying that the backpack was in the front passenger's seat tucked between Lowery's legs when they were pulled over); Lowery Dep. 51–52 (same).)  Castro claims that the bag was open, (Warshawsky Decl. Ex. 7 ("Castro Dep."), at 16–17), but Plaintiff and Lowery claim the backpack was closed, (Pl.'s Dep. 146; Lowery Dep. 52).  Moreover, Plaintiff testified that she did not touch the bag during the traffic stop, (Pl.'s Dep. 146), and Castro and Eaton did not observe her doing so, (Castro Dep. 18; Warshawsky Decl. Ex. 8 ("Eaton Dep."), at 24).  After Castro overheard Plaintiff tell Eaton that they were coming from Albany, he asked Lowery to step out of the vehicle and accompany him to the front.  (Defs.' 56.1 ¶ 20.)  Castro asked Lowery questions about where he was going, where he was coming from, and why he was in New York. (*Id.* ¶ 21.)  After conferring with each other, Defendants told Plaintiff that there were

"inconsistencies" between Plaintiff's and Lowery's answers to similar questions. (*Id.* ¶ 22*; see also* Lowery Dep. 58 (testifying that he told Castro he was coming from Brooklyn).)

Based on these inconsistencies, Defendants believed there was "a founded suspicion of criminal activity." (Castro Decl. ¶ 20; Eaton Decl. ¶ 23.) Castro then conducted a search of the vehicle and found 501 grams of heroin and $1,190 in United States currency in the backpack on the floor of the front passenger seat. (Defs.' 56.1 ¶ 23.) They also found men's clothing, but no women's clothing, inside the backpack. (Castro Dep. 25–26; Eaton Dep. 28–29.) It is disputed whether Defendants had consent to conduct this search. Defendants contend that Plaintiff consented to the vehicle search. (Castro Decl. ¶ 20; Eaton Decl. ¶ 23.) Plaintiff, however, denies consenting to the search, (Pl.'s Dep. 145), and claims she told Eaton that Defendants would have to ask Lowery for consent, (*id.* at 74–75). Defendants did not obtain Lowery's consent. (Lowery Dep. 60–61; Eaton Dep. 29.)[4] The Parties also dispute whether Lowery told Defendants that the backpack and the heroin inside of it belonged to him. (*Compare* Lowery Dep. 63 ("I let them know that's mine"), *id.* at 87 ("[T]hey asked me. I told them that it was mine. It was my book bag."), Pl.'s Dep. 78–80, 146 (testifying that Defendants asked Lowery and he said it was his backpack, but no one asked her) *with* Castro Dep. 37 (testifying that "no persons took ownership of" the heroin "at the point of the seizure"), Castro Decl. ¶ 23 ("At no point during this time did Mr. Lowery advise us that he was the owner of the heroin."), Eaton Decl. ¶ 27 (same); *see also* Eaton Dep. 51–52 (testifying that he "would not have charged [Plaintiff] if [Lowery] was taking the full responsibility for [the drugs]".)

---

[4] Plaintiff cites Castro's testimony that he did not believe they needed specific consent to search Lowery's bag because they had Plaintiff's consent to search the vehicle, but Plaintiff failed to submit the cited pages of Castro's deposition to the Court. (Pl.'s 56.1 ¶ 23.)

Based on the discovery of the heroin and $1,190, Defendants handcuffed Plaintiff and Lowery and secured them in the patrol car. (Defs.' 56.1 ¶ 24.) Castro secured the evidence in the trunk of the patrol car. (*Id.* ¶ 25.) Castro then completed the search of the rental vehicle, including Plaintiff's bag, which was in the back seat of the vehicle. (*Id.* ¶ 26.) Defendants did not ask for or obtain Plaintiff's consent to search her bag. (Pl.'s Dep. 147–48; Castro Dep. 26.) Castro arranged for the rental vehicle to be impounded to the State Police ("SP") Montgomery station. (Defs.' 56.1 ¶ 27.) At approximately 9:30 pm, Defendants transported Plaintiff and Lowery in their marked patrol car to the SP Montgomery station. (*Id.* ¶ 28.) The entire traffic stop and arrest at the side of the road lasted approximately 30 minutes. (*Id.* ¶ 29.)

Defendants notified SP Investigator Donald DeQuarto ("DeQuarto") of the incident. (*Id.* ¶ 30.) At the station, Castro, Eaton, and DeQuarto decided that there was probable cause to formally charge Plaintiff and Lowery with felony Criminal Possession of a Controlled Substance in the First Degree (N.Y. Penal Law § 220.21) and felony Criminal Possession of a Controlled Substance in the Third Degree (N.Y. Penal Law § 220.16). (Defs.' 56.1 ¶¶ 31–34; Castro Dep. 35 ("It was a cumulative decision [to charge Plaintiff]."); DeQuarto Decl. ¶¶ 17–18 (declaring that he made a probable cause determination "[b]ased on the information [he] was given by [Defendants]").) Castro specifically testified that he believed Plaintiff should be charged with these crimes because of (1) "the evidence that was presented to [them]"—namely, the heroin, which was within grabbing reach and not claimed to be solely owned by either person; (2) "the flight risk of both individuals[,] who currently reside . . . in Ohio;" (3) "the two differen[t] or very contrasting difference[s] in stories;" and (4) the "potential that Mr. Lowery could possibly change his story and switch to say that [Plaintiff] did [participate]," which would require Defendants to "go into Ohio and seize her . . . [which] would be a difficult endeavor." (Castro

Dep. 36–39.)  Castro prepared the felony complaints, which were generated in the SP TRACS system at 10:37 pm.  (Defs.' 56.1 ¶ 35.)  Eaton submitted the information required to process Plaintiff's arrest charges at approximately 11:08 pm.  (*Id.* ¶ 36.)  Eaton also issued Plaintiff two uniform traffic tickets for violating New York VTL §§ 1128(d) and 1181(a).  (*Id.* ¶ 37.)

At approximately 11:25 pm, while being interviewed at the station by DeQuarto, Lowery verbally admitted to ownership of the heroin, (*id.* ¶ 38), although Plaintiff maintains Lowery already told Defendants this at the scene, (Pl.'s 56.1 ¶ 38).  From 12:05 am to 12:15 pm, Castro conducted a formal interview with Lowery and elicited a statement acknowledging his ownership of the heroin.  (Defs' 56.1 ¶ 40.)  Castro avers that Plaintiff refused to provide a statement to him, (Castro Decl. ¶ 31), but Plaintiff claims that Defendants did not bother to interview her about the heroin, (Pl.'s Dep. 92 (testifying that Defendants did not try to talk to her after arresting her); *id.* at 97 ("[Defendants] just focused on asking [Lowery] the questions.  They didn't say anything to me at all."); Lowery Dep. 65 (testifying that he did not see anyone interview Plaintiff); Castro Dep. 37 (testifying that he did not ask Plaintiff if she was the owner of the heroin); *id.* (testifying that Plaintiff was cooperative "[u]ntil the point of arraignment"); Castro Incident Statement (not mentioning this)).[5]

At approximately 1:00 am on July 31, 2015, Defendants drove Plaintiff and Lowery to the Village of Walden court for their arraignment.  (Defs.' 56.1 ¶ 42.)  At approximately 2:00 am, Plaintiff and Lowery were arraigned by Town Justice Raynard Ozman, and subsequently remanded to Orange County Jail without bail.  (*Id.* ¶ 43.)  After the arraignment, Defendants transported Plaintiff and Lowery to the Orange County Jail.  (*Id.* ¶ 44.)  Plaintiff never talked to

_____

[5] DeQuarto also avers that he attempted to interview Plaintiff but she declined to speak with him.  (DeQuarto Decl. ¶ 15.)

or saw Defendants again, and Defendants had no contact with Plaintiff or involvement with her prosecution afterwards.  (*Id.* ¶¶ 45–47.)  On September 5, 2015, Plaintiff was released from custody on her own recognizance.  (*Id.* ¶ 48.)  On October 7, 2015, the charges against Plaintiff were adjourned for six months in contemplation of dismissal.  (*Id.* ¶ 49; *see also* Pl.'s 56.1 ¶ 37 (traffic citations).)

B.  Procedural History

Plaintiff filed the Complaint on March 31, 2016.  (Compl.)  Defendants filed an Answer on June 1, 2016.  (Answer (Dkt. No. 11).)  The Court held an initial conference and adopted a case management order on September 21, 2016.  (*See* Dkt. (entry for Sept. 21, 2016); Order (Dkt. No. 14).)  On April 27, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move for summary judgment.  (Letter from Mary Kim, Esq. to Court (April 27, 2017) (Dkt. No. 25).)  Plaintiff filed a letter in response on May 3, 2017.  (Letter from Steven M. Warshawsky, Esq. to Court (May 3, 2017) (Dkt. No. 26).)  The Court held a pre-motion conference on May 24, 2017 and ordered the Parties to file supplemental pre-motion letters after Lowery's deposition.  (*See* Dkt. (entry for May 24, 2017).)  After the Parties filed these supplemental pre-motion letters, (Dkt. Nos. 31–32), the Court held another pre-motion conference on June 22, 2017 and set a briefing schedule, (*see* Dkt. (entry for June 22, 2017); Order (Dkt. No. 34)).

Defendants filed the instant Summary Judgment Motion and accompanying papers on September 1, 2017.  (Not. of Mot.; Castro Decl.; Eaton Decl.; DeQuarto Decl.; Vogel Decl.; Defs.' 56.1; Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 43).)  Plaintiff filed an opposition and accompanying papers on October 6, 2017.  (Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 44); Warshawsky Decl.)  Defendants filed

a reply on October 27, 2017.  (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.'
Reply") (Dkt. No. 47).)

II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.
2014) (same).  "In determining whether summary judgment is appropriate," a court must
"construe the facts in the light most favorable to the non-moving party and . . . resolve all
ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653
F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper
Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014)
(same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy
Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

 "However, when the burden of proof at trial would fall on the nonmoving party, it
ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an
essential element of the nonmovant's claim," in which case "the nonmoving party must come
forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to
avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114,
123 (2d Cir. 2013) (alteration and internal quotation marks omitted).  Further, "[t]o survive a
[summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical'
possibility that his allegations were correct; he need[s] to 'come forward with specific facts
showing that there is a genuine issue for trial,'"  *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d

Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B.  Analysis

Plaintiff brings claims for (1) the traffic stop; (2) the custodial interrogation at the traffic stop; (3) false arrest; and (4) the search of her personal bag.  (Compl.; Pl.'s Mem. 2.)  Defendants argue that these claims fail as a matter of law and that they are entitled to qualified immunity for any constitutional violations.  (Defs.' Mem.)  The Court will address each claim separately.

1.  The Traffic Stop

Plaintiff argues that Defendants subjected her to an illegal traffic stop which constituted an unreasonable seizure under the Fourth Amendment.  (Pl.'s Mem. 5.)  *See* U.S. Const. amend. IV (prohibiting "unreasonable searches and seizures").  "The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a 'seizure' of the person."  *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005).  Accordingly, "such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *U.S. v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (internal quotation marks omitted).  In other words, they "must not be unreasonable."  *Gilles v. Repicky*, 511 F.3d 239, 244–45 (2d Cir. 2007).  Whether these standards are met "is an objective inquiry; the actual motivations of the individual officers involved in the stop play no role in the analysis."  *Holeman*, 425 F.3d at 190 (internal quotation marks omitted).[6]  "Traffic

_____

[6] Plaintiff claims that Defendants stopped her vehicle because "it had out of state license plates and was occupied by two young black persons," (Pl.'s Mem. 3), but cites no evidence for this speculative assertion.  Indeed, it is undisputed that Defendants could not identify the race of the vehicle occupants when they pulled the vehicle over.  (Eaton Decl. ¶ 13; Castro Decl. ¶ 13.) In any event, this would not change the Fourth Amendment analysis.  *See United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."); *United States v. Santillian*, No. 13-CR-138, 2013 WL 4017167, at *6 (S.D.N.Y. Aug. 7, 2013) ("[E]ven if [the] [d]efendants could demonstrate that the stop were pretextual, as long as [the officer] had reasonable suspicion to believe that a traffic violation had occurred, whether he had an ulterior motive is irrelevant to the Fourth Amendment analysis."

stops are presumptively reasonable under the Fourth Amendment if the officer has probable

cause to believe that a traffic infraction has occurred." *United States v. Foreste*, 780 F.3d 518,

523 (2d Cir. 2015); *see also Scopo*, 19 F.3d at 782 ("When an officer observes a traffic offense—

however minor—he has probable cause to stop the driver of the vehicle." (citation and internal

quotation marks omitted)); *Deanda v. Hicks*, 137 F. Supp. 3d 543, 561 (S.D.N.Y. 2015)

(collecting cases). Where there are "two independent traffic violations upon which . . . officers

legitimately could have based a traffic stop," only one need be valid to justify a traffic stop under

the Fourth Amendment. *United States v. Garcia*, 279 F. Supp. 2d 294, 298–99 (S.D.N.Y 2003).

Defendants argue that they had probable cause or reasonable suspicion to initiate the

traffic stop because they observed Plaintiff committing traffic violations. (Defs.' Mem. 21–23.)

Specifically, they claim they observed Plaintiff (1) cross over a solid yellow line while driving,

in violation of N.Y. VTL § 1128(d), and (2) thereafter significantly reduce her speed, which

impeded the flow of traffic, in violation of N.Y. VTL § 1181(a). (Defs.' Mem. 22.) Plaintiff

denies crossing over any yellow lines, (Pl.'s Dep. 143–44), which is corroborated by Lowery's

testimony that the rental vehicle never changed lanes or swerved, (Lowery Dep. 43, 49). This

dispute of fact therefore precludes summary judgment on this proffered justification for the

traffic stop. *See Ikezi v. City of New York*, No. 14-CV-5905, 2017 WL 1233841, at *5–6

(E.D.N.Y. Mar. 31, 2017) (finding dispute of fact with respect to reasonable suspicion based on

traffic violation when the "[p]laintiffs contend that [the driver] never changed or swerved out of

his lane"); *see also Pane v. Gramaglia*, 509 F. App'x 101, 103 (2d Cir. 2013) (denying summary

judgment because the plaintiff "disputes [the defendant]'s observations" and thus, crediting the

---

(internal quotation marks omitted)), *aff'd*, — F.3d —, 2018 WL 4038032 (2d Cir. Aug. 24,
2018).

plaintiff's account, "the facts d[id] not support a reasonable suspicion of criminal activity"); *cf. Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 358 (S.D.N.Y. 2007) ("[The] plaintiff does not dispute that she in fact crossed over a double-yellow line—a violation that itself justifies the traffic stop."). Indeed, Defendants appear to acknowledge this dispute. (*See* Defs.' Mem. 22.)

However, the second purported traffic violation—slowing down to impede traffic—presents a closer question. The New York traffic law in question provides:

> No person shall drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or in compliance with law.

N.Y. VTL § 1181(a).[7] Defendants aver that they observed Plaintiff significantly reduce her vehicle's speed after merging into the driving lane, which interfered with the flow of traffic in that lane and caused at least three vehicles to pull around her to pass her. (Eaton Decl. ¶¶ 9–10; Castro Decl. ¶ 9–10.) Further, Castro claims that he drove into the lane next to Plaintiff's and determined that Plaintiff's vehicle was moving at 50 miles per hour in a posted 65 mile per hour zone. (Castro Decl. ¶ 11; Eaton Decl. ¶ 11.) Defendants aver that they observed Plaintiff's vehicle for approximately one mile before pulling her over. (Castro Decl. ¶ 12; Eaton Decl. ¶ 12.)

Plaintiff's testimony, although somewhat convoluted, provides a conflicting version of events. According to Plaintiff, she merged onto a "confusing," multi-lane highway, at which point she was in a right-hand lane, but attempted to merge into the middle lane, and Defendants' patrol car was one lane further left. (Pl.'s Dep. 54–58.) Plaintiff let a semi-truck "go by because [she] was a little scared," and then got behind it. (*Id.* at 55–56; *see also id.* at 60.) Defendants

---

[7] Defendants cite only this provision, and do not rely on § 1181(b), which relates to driving under the minimum speed limit on a highway. (Defs.' Mem. 22 (citing Eaton Decl. ¶ 9; Castro Decl. ¶ 9).)

were next to Plaintiff's car in the lane to the left, but at some point, Plaintiff and the semi-truck passed Defendants. (*Id.* at 55–60.) Eventually, Defendants ended up behind Plaintiff's vehicle, and they put on their lights to pull her over. (*Id.* at 62–63.) This had been "maybe just a couple minutes" after Plaintiff had entered the highway, and she "could still see where [they] got [on]" the highway behind them. (*Id.* at 52–53.) Although Plaintiff testified that she did not know the exact speed she was driving or the speed limit for the highway, (*id.* at 52, 57, 65), she "want[ed] to say that [she] was" doing the same speed as the other vehicles on the road, "because [she] had cars traveling alongside of [her]." (*Id.* at 52–53.) Plaintiff said she "was just trying to keep up with the traffic," (*id.* at 53), specifically "the semi truck that was in front of [her]" and "the cars that were all coming into the lane, so [she] wasn't looking at [her] speed," (*id.* at 57; *see also id.* at 63 ("I know I didn't go any faster than what the car in front of me was going.")). And, Plaintiff specifically denied "driving too slow for the flow of traffic on the highway," (*id.* at 149), or reducing her speed significantly to impede traffic behind her, stating, "[t]he only time I slowed down was when [Defendants] w[ere] pulling us over," (*id.* at 144).

Drawing all reasonable inferences in Plaintiff's favor, her testimony creates a dispute of fact regarding whether she was driving "at such a slow speed as to impede the normal and reasonable movement of traffic." N.Y. VTL § 1181(a). Although Defendants claim that traffic built up around Plaintiff and that cars had to pass her vehicle, a reasonable juror could instead credit Plaintiff's testimony that she *was* keeping up with traffic, specifically the semi-truck in front of her, and was driving close to or at the same speed of other vehicles on the highway. Defendants argue that Plaintiff's testimony provides only vague denials that do not create a dispute of fact, but this is inaccurate. (Defs.' Mem. 22–23.) Plaintiff provided an alternative version of events in which she was not moving slowly and impeding traffic, but rather was

keeping up with traffic and, if anything, merely following the slow semi-truck in front of her. *Cf. Briukhan v. City of New York*, 147 F. Supp. 3d 56, 60 (E.D.N.Y. 2015) (finding no dispute of fact from deposition in which the plaintiff "did not contest that he changed lanes, answering instead: 'I don't know'"); *Minasi v. City of Utica*, No. 10-CV-975, 2011 WL 6842988, at *4 (N.D.N.Y. Dec. 29, 2011) (granting summary judgment motion because it was undisputed that the police officer "observed [the] plaintiff double parked" and "had no reason to believe nor d[id] [the] plaintiff contend that he was double parked because it was necessary to avoid conflict with other traffic" or "was in compliance with the law"). That Plaintiff does not know when Defendants' car got behind her car does not mean her testimony regarding her speed and effect on traffic cannot create a dispute of fact regarding what Defendants observed. (*Contra* Defs.' Reply 2.) *See Ikezi*, 2017 WL 1233841, at *6 (finding dispute of fact where the plaintiffs claimed that the driver never took the actions the police claimed to observe). Indeed, although at times conflicting some of Plaintiff's version of events, Lowery similarly testified that the rental vehicle "was doing, like 60 [miles per hour] maybe." (Lowery Dep. 46.)[8]

Alternatively, Defendants argue that, even if they "mistakenly determined that Plaintiff was impeding the course of traffic," the traffic stop was still valid because Defendants have "set forth specific and articulable facts to support their reasonable suspicion." (Defs.' Mem. 23.)

---

[8] Defendants argue that Lowery's testimony only relates to when they "got on the highway," (Defs.' Reply 3), but Lowery was answering a question about the speed their vehicle was traveling at the time that another car allegedly passed them, (Lowery Dep. 46). This is consistent with Plaintiff's testimony that another vehicle came from behind and passed them as she waited for the semi-truck to pass before merging behind it. (Pl.'s Dep. 55.) And, to the extent Defendants point to Lowery's testimony as evidence that vehicles had to pass Plaintiff because she was driving too slow, this is directly contradictory with their argument that Plaintiff's testimony should be discounted because it relates to "the speed Plaintiff was driving when she merged," and not when she was driving later on the highway. (Defs.' Reply 2–3.) Put differently, Defendants cannot simultaneously argue that merging speed is irrelevant while also arguing that events occurring during merging prove Plaintiffs were driving too slow.

However, the cited case is inapplicable, because this is not a case in which Defendants are arguing that they were *mistaken* about whether Plaintiff violated the traffic laws. *See United States v. Santillian*, No. 13-CR-138, 2013 WL 4017167, at *6 (S.D.N.Y. Aug. 7, 2013) ("Regardless of whether [the defendant]'s belief as to the traffic violations was mistaken, or the stop was pretextual, [the defendant]'s reasonable suspicion that the Volkswagen was violating traffic laws is thus enough to justify the stop at its inception." (citing *United States v. Jenkins*, 452 F.3d 207, 211–12 (2d Cir. 2006) ("[B]ecause the officers had a reasonable but mistaken belief that the SUV lacked license plates, stopping the vehicle was justified at its inception." (internal quotation marks omitted)))), *aff'd*, 2018 WL 4038032 (2d Cir. Aug. 24, 2018); *cf. United States v. Moore*, No. 10-CR-971, 2011 WL 6325973, at *8 n.6 (S.D.N.Y. Dec. 19, 2011) (explaining that "*Jenkins* [wa]s not on point" because there was no "reasonable mistake" of fact (internal quotation marks omitted)).  If the Court were to adopt Defendants' interpretation of this "reasonable mistake" doctrine, a § 1983 plaintiff could never defeat summary judgment in an unlawful traffic stop case, because a police officer could simply claim that any dispute of fact regarding a purported traffic violation is only proof of a mistake, not an unjustifiable stop.  Indeed, it is telling that the Court has found no cases applying this doctrine in the civil context.

Accordingly, because there is a dispute of fact regarding Defendants' probable cause or reasonable suspicion for the traffic stop, the Court denies Defendants' Motion for Summary Judgment on this claim.

### 2. The Custodial Interrogation

Plaintiff also argues that Defendants subjected her to an unreasonable seizure when they conducted a custodial interrogation at the traffic stop.  (Pl.'s Mem. 6.)  Defendants argue that the custodial interrogation was lawful because it was pursuant to a lawful traffic stop.  (*See* Defs.'

Mem. 23–25 ("Defendants' actions pursuant to their lawful traffic stop did not violate Plaintiff's Fourth Amendment rights."); Defs.' Reply 4 ("[I]f the traffic stop was lawful, Defendants' temporary detention of Plaintiff was also lawful.").)  They do not argue that the traffic stop and subsequent questioning of Plaintiff was otherwise reasonable even if they lacked probable cause or reasonable suspicion to conduct the initial traffic stop.  For example, they do not argue that this was a "random traffic stop for the purpose of" enforcing a state traffic law, such that the Court must assess whether the stop was reasonable even absent probable cause.  *See Whren v. United States*, 517 U.S. 806, 817 (1996) (distinguishing between traffic cases involving probable cause based upon an observed traffic violation and stops without probable cause).

To be sure, "[t]he temporary detention of a motorist upon probable cause to believe that [s]he has violated traffic laws does not violate the Fourth Amendment's prohibition against unreasonable seizures, even if a reasonable officer would not have stopped the motorist absent some additional law enforcement objective."  *Santillian*, 2013 WL 4017167, at *6 (citing *Whren*, 517 U.S. at 806).  But, while the Fourth Amendment permits some form of interrogation during a *lawful* traffic stop, the same cannot be said of an unlawful traffic stop, done without probable cause or reasonable suspicion that a traffic violation—or any other crime—has occurred.  As the Supreme Court has explained:

> Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns[.] . . . Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

*Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (alterations, citations, and internal quotation marks omitted).  The cases cited by Defendants are not to the contrary.  *See*

*Foreste*, 780 F.3d at 523 ("During a stop, an officer may question the occupants of a vehicle about matters unrelated to the stop as long as the inquiries do not measurably extend the duration of the stop."); *Merring v. Town of Tuxedo*, No. 07-CV-10381, 2009 WL 849752, at *6 (S.D.N.Y. Mar. 31, 2009) ("[T]he first *Terry* condition is satisfied in this case as there is no dispute that it was objectively reasonable for [the] [o]fficer . . . to undertake a vehicle and traffic stop to ticket [the] [p]laintiff for traveling seventy-two miles per hour in a fifty-five miles per hour zone in violation of New York State Vehicle and Traffic Law Section 1180(b).").

Because there is a dispute of fact regarding whether the initial traffic stop was justified, the Court cannot determine as a matter of law that the resulting interrogation pursuant to that traffic stop was justified. Therefore, the Court denies Defendants' Motion for Summary Judgment on this claim.

### 3. The False Arrest

Plaintiff argues that Defendants subjected her to a false arrest by detaining and handcuffing her at the traffic stop. (Pl.'s Mem. 7–12.) "A [§] 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (internal quotation marks omitted). "Under New York law, a false arrest claim requires a plaintiff to show that the defendant intentionally confined h[er] without h[er] consent and without justification." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (internal quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (per curiam) ("Under New York law, an action for false arrest requires that the plaintiff show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4)

the confinement was not otherwise privileged." (internal quotation marks omitted)); *Vasquez v. Reilly*, No. 15-CV-9528, 2017 WL 946306, at *7 (S.D.N.Y. Mar. 9, 2017) (same).

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Scalpi v. Town of East Fishkill*, No. 14-CV-2126, 2016 WL 858944, at *10 (S.D.N.Y. Feb. 29, 2016) (same). Therefore, probable cause is generally a complete defense to an action for false arrest. *See Simpson*, 793 F.3d at 265. In general, probable cause exists where an arresting officer "has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (internal quotation marks omitted). Probable cause is measured based on "those facts available to the officer at the time of arrest and immediately before it," and the existence of probable cause must be determined based on the "totality of the circumstances." *Id.* (internal quotation marks omitted). A court assessing probable cause must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation marks omitted).

Defendants argue that they had probable cause to arrest Plaintiff for violating New York Penal Law § 220.21 after they discovered the heroin in the rental vehicle. (Defs.' Mem. 8–11.)[9]

_____

[9] Plaintiff has withdrawn her claim relating to the search of the rental vehicle, conceding she lacks standing to bring it. (Pl.'s Mem. 7.) In any event, even if the heroin was only obtained as a result of the allegedly illegal traffic stop and illegal search, it still may constitute probable cause to arrest Plaintiff. *See Lawrence v. City Cadillac*, No. 10-CV-3324, 2010 WL 5174209, at *5 (S.D.N.Y. Dec. 9, 2010) (explaining that the fruit of the poisonous tree doctrine does not apply in § 1983 actions and finding that evidence "obtained pursuant to [a] traffic stop is permissible evidence of probable cause to arrest [the] plaintiff, even if the traffic stop were

"A person is guilty of criminal possession of a controlled substance in the first degree when . . .

she knowingly and unlawfully possesses" illegal narcotics in certain specified amounts.  N.Y.

Penal Law § 220.21.  "'Possess' means to have physical possession or otherwise to exercise

dominion or control over tangible property."  *Id.* § 10.00(8); *see also Valerio v. Phillips*, No. 02-

CV-903, 2008 WL 305007, at *12 (W.D.N.Y. Feb. 1, 2008) ("When a defendant is accused of

criminally possessing a controlled substance, the 'possession' may be actual or constructive."

(citing *People v. Sierra*, 379 N.E.2d 196, 198 (N.Y. 1978))).  "A person acts knowingly with

respect to conduct or to a circumstance described by a statute defining an offense when [s]he is

aware that h[er] conduct is of such nature or that such circumstance exists."  N.Y. Penal Law

§ 15.05(2).  "'Knowledge' may be shown circumstantially by conduct or directly by admission,

or indirectly by contradictory statements from which guilt may be inferred and generally,

possession suffices to permit the inference that the possessor knows what [s]he possesses,

especially, but not exclusively, if it is . . . in h[er] vehicle."  *Sierra*, 379 N.E.2d at 198

(alterations and internal quotation marks omitted).

The totality of the undisputed evidence here shows that Defendants had "knowledge or

reasonably trustworthy information of facts and circumstances that [were] sufficient to warrant a

person of reasonable caution" to believe Plaintiff knowingly and unlawfully possessed heroin.

*Simpson*, 793 F.3d at 265.  After receiving inconsistent answers from Plaintiff and Lowery

regarding the origin, destination, and purpose of their trip, Defendants believed there was a well-

founded suspicion of criminal activity.  (Defs.' 56.1 ¶ 22; Castro Decl. ¶ 20; Eaton Decl. ¶ 23.)

---

unlawful"); *see also Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) (explaining
that "[t]he fruit of the poisonous tree doctrine is an evidentiary rule that operates in the context of
criminal procedure . . . and as such has generally been held to apply only in criminal trials"
(citations and internal quotation marks omitted)).

*See Stansbury v. Wertman*, 721 F.3d 84, 92 (2d Cir. 2013) ("Courts consider several factors when determining probable cause, including the defendant's . . . evasive or contradictory answers to questions." (alteration and internal quotation marks omitted)); *United States v. Trapp*, No. 13-CR-62, 2014 WL 1117012, at *11 (D. Vt. Mar. 20, 2014) (finding that the defendant "gave non-credible answers as to the origin of the money," which supported probable cause determination); *Reddick v. Yelich*, No. 09-CV-9500, 2011 WL 7004396, at *8 (S.D.N.Y. Aug. 3, 2011) (noting that police may have probable cause based on suspicious activity, including, for example, "inconsistent answers"), *adopted by*, 2012 WL 94562 (S.D.N.Y. Jan. 12, 2012); *see also Sierra*, 379 N.E.2d at 198 (noting that "knowledge" under the New York Penal Law can be shown "indirectly by contradictory statements from which guilt may be inferred"). Upon searching the rental vehicle, Defendants found 501 grams of heroin and $1,190 in United States currency in a backpack on the floor of the front passenger seat. (Defs.' 56.1 ¶ 23.) Although the backpack was between Lowery's legs, not Plaintiff's, (*id.*), Defendants observed only Lowery, (*id.* ¶ 16), not Plaintiff, touching the bag, (Pl.'s Dep. 146; Castro Dep. 18; Eaton Dep. 24), and the backpack contained only men's clothing, (Castro Dep. 25–26; Eaton Dep. 28–29), the backpack was within Plaintiff's reach as the driver of the vehicle.[10] *See Pringle*, 540 U.S. at 372 (noting that "[f]ive plastic glassine baggies of cocaine were behind the back-seat armrest and accessible to all three" occupants of the car, including the plaintiff sitting in the front passenger seat); *De La Cruz v. City of New York*, No. 11-CV-8395, 2014 WL 3719164, at *5 (S.D.N.Y. June 26, 2014) (finding probable cause to arrest the plaintiff, who was sitting in the back seat of

---

[10] Plaintiff portrays these as material disputes of fact, but cites no cases finding similar facts preclude a probable cause finding where a driver is within reaching distance of the contraband, let alone where the driver also provided suspicious answers to officer's questions regarding the vehicle's activity. (Pl.'s Mem. 9.)

a car, where the officers "recovered a large quantity of controlled substances from inside the [c]ar, some of which were located in the center console area of the [c]ar, and within each passenger's easy reach"); *Elk v. Townson*, 839 F. Supp. 1047, 1051 (S.D.N.Y. 1993) (finding no dispute as to probable cause where "a canister of marijuana was found in the front seat space . . . next to [the plaintiff] within his easy reach," and thus "constructive possession could have been imputed to" him).

New York also has a statutory presumption applicable to automobiles recognizing that "[t]he presence of a controlled substance in an automobile . . . is presumptive evidence of knowing possession thereof by each and every person in the automobile at the time such controlled substance was found."  N.Y. Penal Law § 220.25; *see also Valerio*, 2008 WL 305007, at *12 (same).  Plaintiff argues that this presumption does not apply because the heroin was found "inside the closed backpack," not "in an automobile."  (Pl.'s Mem. 10–12.)  However, she cites no cases supporting such a distinction for probable cause purposes, and indeed, some courts have upheld application of the automobile presumption where contraband was found inside a bag in a vehicle.  *See, e.g.*, *Dixon v. Miller*, 293 F.3d 74, 77, 87 (2d Cir. 2002) (upholding inference that the plaintiff "knowingly possessed . . . heroin" where the police "observed [the passenger's] hand moving across the front seat near a partially concealed gun" and, after searching the car, discovered a "brown paper bag" containing heroin underneath the driver's seat); *Talukder v. City of Troy*, No. 12-CV-1765, 2014 WL 3670770, at *5 (N.D.N.Y. July 23, 2014) (finding that "[i]t was reasonable for the officers to conclude that [the] [p]laintiff had committed a crime based on [the § 220.25(1)] presumption" where an inventory search revealed "two packages of cocaine in the vehicle"); *People v. Renaud*, 788 N.Y.S.2d 551, 555 (Niagara Cty. Ct. 2004) (applying statutory presumption where "contraband [was] discovered in [a] yellow backpack lying directly

at [the] [d]efendant['s] . . . feet").  Furthermore, Plaintiff argues that extending this automobile presumption to her case "would be contrary to established Fourth Amendment doctrine."  (Pl.'s Mem. 10.)  Although "[m]ere proximity [to contraband] or presence is . . . insufficient to support a [jury] finding of constructive possession," *United States v. Rodriguez*, 392 F.3d 539, 548 (2d Cir. 2004), the evidence in this case—which needs to support only a *probable cause* determination, not a guilty verdict after trial—involves more than Plaintiff's presence, *see Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) ("[O]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." (internal quotation marks omitted)).[11]  As explained above, Plaintiff gave answers to questions that made little sense and that were inconsistent with Lowery's answers, and a large amount of drugs was found in close proximity to her.

In *Maryland v. Pringle*, a case Plaintiff heavily relies on, the Supreme Court actually explained why it is reasonable for police officers to infer that passengers in a car where drugs are found are involved in a common criminal enterprise:

> This case is quite different from [*Ybarra v. Illinois*, 444 U.S. 85 (1979)].  Pringle and his two companions were in a relatively small automobile, not a public tavern.  In *Wyoming v. Houghton*, 526 U.S. 295 (1999), we noted that "a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 304–305.  Here we think it was reasonable for the officer to infer a common enterprise among the three men. The quantity of drugs and cash in the car indicated the likelihood of drug dealing, an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him.

---

[11] Thus, to the extent Plaintiff is arguing that the evidence here is insufficient to support a jury verdict of guilty, (Pl.'s Mem. 8 (citing New York Criminal Jury Instructions for constructive possession)), or that Defendants cannot "prove, as a matter of law, that [Plaintiff] *knew* there was heroin inside Mr. Lowery's backpack," (*id.* at 9–10), this is not the correct standard to apply when evaluating probable cause, *see Simpson*, 793 F.3d at 265 (describing probable cause standard).

540 U.S. at 373. This is consistent with the rationale behind the presumption in § 220.25(1), which "reject[s] the possibility that persons transporting [large] quantities of contraband are likely to go driving around with innocent friends or that they are likely to pick up strangers," and instead "find[s] it more reasonable to believe that the bare presence in the vehicle" more likely than not evidences knowing possession of the drugs. *Lopez ex rel. Garcia v. Curry*, 583 F.2d 1188, 1191–92 (2d Cir. 1978). Therefore, the Supreme Court concluded in *Pringle* that police officers had probable cause to arrest the plaintiff, the front-seat passenger in a car containing five plastic glassine baggies of cocaine behind the back-seat armrest, finding "it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." *Pringle*, 540 U.S. at 372; *cf. United States v. Mayberry*, No. 12-CR-153, 2013 WL 3560968, at *12 (D. Vt. July 11, 2013) (distinguishing *Pringle* because "[h]ere, the incriminating evidence was found in the trunk of the vehicle, where neither [defendant] had immediate access").

However, Plaintiff argues that *Pringle* supports her argument, because "[u]pon questioning," the three defendants in that case "failed to offer any information with respect to the ownership of the cocaine or the money" found in the car. *Pringle*, 540 U.S. at 372. By contrast, Plaintiff contends, Lowery claimed ownership of the backpack containing the heroin and clearly exercised sole control over it. (Pl.'s Mem. 11–12.) As an initial matter, the Supreme Court did not base its holding in *Pringle* exclusively on the fact that all three vehicle occupants denied ownership of the contraband; rather, the court focused on the "small" size of the car, the fact that passengers are often involved in a "common enterprise," particularly when such a large quantity of drugs and cash is present, and that the baggies of cocaine were "accessible to all three men"— including the driver and the front seat passenger, even though it was "behind the back-seat

armrest." *Pringle*, 540 U.S. at 372–73. The Court contrasted Pringle's case with that in *United States v. Di Re*, 332 U.S. 581 (1948), in which officers arrested two passengers in the car, including the defendant, when they had "no information implicating" the defendant or "pointing to [his] possession of coupons," but had only a tip from an informant about a third person, who they saw "holding gasoline ration coupons" in the car. *Pringle*, 540 U.S. at 373–74 (citing *Di Re*, 332 U.S. at 592–94).

In any event, Lowery's testimony does not create a dispute of fact regarding Defendants' probable cause determination. The Parties dispute whether Lowery told Defendants that the backpack and the heroin inside of it belonged to him. (*Compare* Lowery Dep. 63, 87, Pl.'s Dep. 78–80, 146, *with* Castro Dep. 37, Castro Decl. ¶ 23, Eaton Decl. ¶ 27.) However, even drawing all reasonable inferences in favor of Plaintiff and assuming Lowery made the statements he testified to at the time the heroin was discovered, his statements did not exculpate Plaintiff or indicate that she had no knowledge or control over the heroin. Rather, Lowery testified that "when [Defendants] found the heroin, . . . [he] said it was [his]," (Lowery Dep. 63), and that when they asked him if the backpack belonged to him, he "told them that it was . . . [his] book bag," (*id.* at 87). When asked if he told Defendants anything else after saying the heroin was his, Lowery testified, "[n]ot that I know of, no. Not that I recall." (*Id.* at 63.) This testimony does not, without more, undermine Defendants' inference, based on the totality of the evidence before them, that Plaintiff, who gave conflicting answers from Lowery about why they were in New York and where they were coming from, knowingly possessed the 501 grams of heroin siting on the floor next to her. *See Waddlington v. City of New York*, 971 F. Supp. 2d 286, 294 (E.D.N.Y. 2013) ("Even assuming that [another individual] informed [the searching officer] that the illegal items belonged to him . . . such facts in no way impact whether [the] [p]laintiff was 'in close

proximity to [the] controlled substance at the time [the] controlled substance was found.'" (quoting § 220.25(2))); *see also United States v. Clark*, 638 F.3d 89, 95 (2d Cir. 2011) ("Control, after all, can be manifested in various ways—e.g., ownership, occupancy, access, authority to exclude others—and exercised to varying degrees." (italics omitted)); *United States v. Patrick*, 899 F.2d 169, 172 (2d Cir. 1990) (finding "an adequate basis for the officials to reasonably believe that [the defendant] was not just a mere innocent traveling companion but was traveling *and* acting in concert with [the co-defendant] in transporting the cocaine" that was in the co-defendant's purse). The only other evidence regarding Lowery's confession of ownership pre-arrest is Plaintiff's own testimony as to what Lowery said, (Pl.'s Dep. 78–80 (testifying what she overheard Lowery say); *id.* at 146 (same)), which is inadmissible hearsay, *see Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017, 2007 WL 2781246, at *16 (S.D.N.Y. Sept. 24, 2007) (explaining that "[t]o be considered on summary judgment, . . . the statements in . . . deposition testimony . . . must be admissible" and not hearsay). Therefore, the Court grants Defendants' Motion for Summary Judgment on the false arrest claim.[12]

---

[12] Although the Court need not reach this argument, Defendants also argue that they are entitled to qualified immunity on the false arrest claim because they had "arguable probable cause" to arrest Plaintiff. (Defs.' Mem. 11–13.) *See Kass v. City of New* York, 864 F.3d 200, 206 (2d Cir. 2017); *see also Deanda*, 137 F. Supp. 3d at 573 (granting summary judgment to defendant because he "was not required to accept the explanations provided by [the] [p]laintiff" and therefore had "at least arguable probable cause to arrest [her]"). Plaintiff does not respond to this argument in any meaningful capacity. (Pl.'s Mem. 12 (mentioning the phrase "arguable probable cause" in parentheses).) The Court could therefore find this argument waived by Plaintiff. *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004) ("[The plaintiff] failed to . . . raise this argument in his opposition to summary judgment. Thus, this argument has been waived."); *Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015) (collecting cases holding that a plaintiff abandons claims when it fails to address a defendant's argument on a motion, regardless of its merit).

4.  The Search of Plaintiff's Bag

Finally, Plaintiff argues that, although Defendants were authorized to "search the remainder of the car for additional contraband" once they discovered the heroin, they were not permitted to search her personal bag without her consent.  (Pl.'s Mem. 12.)  It is undisputed that, after discovering the heroin, Defendants handcuffed Plaintiff and secured her in the patrol car before completing a search of the rental vehicle, including Plaintiff's bag in the back seat, without her consent.  (Defs.' 56.1 ¶¶ 24–26; Pl.'s Dep. 147–48.)  Defendants argue that this search was justified by the search incident to arrest doctrine and by the automobile exception to the warrant requirement.  (Defs.' Mem. 20–21; Defs.' Reply 9–10.)  *See United States v. White*, 298 F. Supp. 3d 451, 459 n.4 (E.D.N.Y. 2018) (noting that the "*Gant* 'search incident to arrest' exception operates in addition to, and not in place of, the [automobile] exception").

"[A]n automobile search incident to a recent occupant's arrest is constitutional . . . if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" *Davis v. United States*, 564 U.S. 229, 234–35 (2011) (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009)).  As long as such a reasonable belief exists, this exception applies "even after the arrestee has been secured and cannot access the interior of the vehicle."  *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 611 (S.D.N.Y.2013) (quoting *United States v. Gonzalez*, 441 F. App'x 31, 34 (2d Cir. 2011)).  In such cases, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein."  *Gant*, 556 U.S. at 344.  Plaintiff does not address the applicability of this doctrine whatsoever in her opposition; she argues only that, because there was no probable cause to arrest her, there could not have been probable cause to search her personal bag.  (Pl.'s Mem. 12.)  The Court already concluded, however, that there was probable cause to arrest Plaintiff for criminal possession of a

controlled substance. Because Defendants found evidence of the crime—heroin and cash—inside the car, it was certainly reasonable to believe that the car contained additional "evidence relevant to the crime of arrest," and thus, they were authorized to search it and any containers therein. *Gant*, 556 U.S. at 343; *see also id.* at 344 (contrasting defendants in other cases who "were arrested for drug offenses" from Gant's case, because he "was arrested for driving with a suspended license—an offense for which police could not expect to find evidence in the passenger compartment of [the] car"); *Lawtone-Bowles v. Katz*, No. 14-CV-606, 2016 WL 6834018, at *9 (S.D.N.Y. Nov. 17, 2016) (upholding search of a plaintiff's handbag incident to arrest at the police station afterwards); *United States v. Faison*, No. 15-CR-186, 2015 WL 5915964, at *7 (S.D.N.Y. Oct. 8, 2015) (finding search of passenger compartment and any containers therein for marijuana reasonable incident to arrest for marijuana possession); *United States v. Brown*, No. 10-CR-675, 2011 WL 3163171, at *5 (E.D.N.Y. July 25, 2011) (finding "warrantless search of the vehicle was proper because the officers had probable cause to believe that the vehicle contained evidence of the drug-related offense for which [the] defendant was arrested").

Additionally, the search of Plaintiff's bag is also covered by the automobile exception. "The automobile exception permits law enforcement officers to search without a warrant a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) (internal quotation marks omitted). "If the exception applies, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* (internal quotation marks omitted); *see also California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is

contained."); *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999) ("We hold that police officers with probable cause to search a car may inspect passengers' belongings found in the car that are capable of concealing the object of the search."); *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004) ("[W]hen the police possess probable cause to believe a vehicle contains contraband, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle." (internal quotation marks omitted)).  In light of Plaintiff's concession that "the discovery of the heroin in . . . Lowery's backpack authorized the troopers to search the remainder of the car for additional contraband," (Pl.'s Mem. 12), the fact that Defendants had probable cause to believe more contraband of the crime of arrest was inside the car, and the fact that the automobile exception permits Defendants to search any potentially concealing object in the car—such as a closed bag—Defendants' search of Plaintiff's bag did not violate the Fourth Amendment.

The Court therefore grants Defendants' Motion for Summary Judgment on the unlawful search claim.[13]

### III.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.  Plaintiff's false arrest and unlawful search claims are dismissed.  The Court will hold a status conference on November 6, 2018 at 10:00 AM to discuss the remaining unreasonable seizure claims relating to the traffic stop and custodial interrogation.

---

[13] The Court therefore need not reach Defendants' alternative argument that they are entitled to qualified immunity for the search.  (Defs.' Mem. 21 n.7.)

The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 37).

SO ORDERED.

DATED: September 28, 2018
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE